UNITED STATES of America

v.

**Samuel GANTT, Appellant.**

UNITED STATES of America

v.

**Milton Charles SMITH a/k/a "Creep" a/k/a "Shaw" a/k/a "Short", Appellant.**

UNITED STATES of America

v.

**Orville Joseph RIDGELY a/k/a "Black", Appellant.**

UNITED STATES of America

v.

**William Cornell FARRELL a/k/a "Suli Abdullah", Appellant.**

UNITED STATES of America

v.

**Alfonso JACKSON, a/k/a Al, Appellant.**

Nos. 78–1399, 78–1570, 78–1571, 78–1599 and 78–1629.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1979.

Decided Jan. 25, 1980.

---

Philip J. Davis, Washington, D.C. (appointed by this Court), for appellant in No. 78–1399.

Richard S. Bromberg, Washington, D.C. (appointed by this Court), for appellant in No. 78–1599.

Stuart Stiller, Washington, D.C., for appellant in No. 78–1629.

William Bingham, Washington, D.C., was on the brief for appellant in Nos. 78–1570 and 78–1571.

Margaret Ellen, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., Washington, D.C., at the time the briefs were filed, John A. Terry and Charles J. Harkins, Jr., Washington, D.C., were on the brief for appellee.

Also John H. Korns, Asst. U. S. Atty., Washington, D.C., entered an appearance for appellee.

Before MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

On September 6, 1977 an indictment naming our appellants and ten other defendants[1] was returned in the District Court. In various counts appellants Smith, a/k/a "Creep", Ridgely, a/k/a "Black", Farrell and Jackson were charged with conspiracy to distribute a controlled substance (21 U.S.C. § 846), traveling in interstate commerce between Washington, D.C. and Los Angeles, California with intent to distribute a controlled substance (18 U.S.C. § 1952), and distribution of a controlled substance (21 U.S.C. § 841(a)). In addition Smith was charged with engaging in a continuing criminal enterprise (21 U.S.C. § 848), and Farrell was charged with using a communication facility to facilitate the distribution of a controlled substance (21 U.S.C. § 843(b)). Appellant Gantt was charged with distributing a controlled substance (21 U.S.C. § 841(a)).

---

1. In addition to the appellants the defendants named in the indictment were Isiah Minder, a/k/a "Mumpsey Bumpsey", Willie Jefferson, John Martin Robinson, a/k/a "Big John", James Lewis Henderson, Jr., a/k/a "Fat James", Harold Elsworth Frazier, a/k/a "Piggy", Carroll Fletcher, a/k/a "Porky", John Doe, Alfred W. Taliaferro, Larry Walker and Lloyd Vernon Spriggs.

A motion for severance by Gantt was granted; his motion to suppress a photographic identification was denied. He was tried by jury, found guilty and placed on probation for three years. Thereafter the other appellants and two co-defendants, Robinson and Henderson, went to trial before a jury.[2] Motions for mistrial by Robinson and Henderson were granted. The appellants were convicted on all counts, sentenced to imprisonment, and they appeal.

## THE GOVERNMENT'S CASE AT TRIAL

To be clearly understood and examined in focus the contentions of the appellants must be considered in the context of the government's case at trial.

At trial the principal, indeed the vital witness for the government was Reginald Farmer. The jury must have believed him; if this were not so there could not have been a conviction. Accordingly we set out Farmer's testimony in some detail.

Farmer, a former resident of Washington, D.C. had repaired to Los Angeles, California where he was employed as a professional actor. He testified that on the morning of March 25, 1975, while having breakfast at a Holiday Inn in Los Angeles, he encountered the defendant Jackson. He had known Jackson since 1962–1963. Jackson said he had been looking for Farmer, that he had come to California to find him, and had brought two other men along. He named the other two as Mumpsey and Jefferson. Mumpsey is defendant Isiah Minder. Jefferson is defendant Willie Jefferson. Jackson said Minder had been involved with a group dealing with heroin out of Holland, but there had been a "massive narcotics bust" and they were now looking for another source. He asked whether Farmer could procure any heroin for these people, as Farmer had done for Jackson on some previous occasion. Farmer said he had not been in touch with his source for some time but he would try. Jackson told Farmer the three men had driven out in his car with some $10,000 "to just get started."

On the afternoon of the same day, March 25, Farmer met Jackson, Minder and Jefferson in their suite at the Holiday Inn. Minder produced a briefcase containing money which Jackson counted out and turned over to Farmer. The amount was about $7,000. Jackson told Farmer to "get going" which Farmer did by locating his "source", a woman named Maria, and telling her he was trying to procure some narcotics. She agreed to assist.

Early on the morning of March 26 Farmer took Maria to the airport, and gave her the money furnished by Jackson and Minder. That afternoon, following her instructions, he placed a telephone call to Tijuana, Mexico, and was told to come there and pick up the heroin. That evening he and his brother-in-law Harvey Wells drove to Tijuana and brought the package of narcotics back to Los Angeles. The next morning Farmer passed the package to Jackson in a restaurant booth. Later that day Jackson told Farmer that Jefferson and Minder had left with the narcotics for the Washington, D.C. area where the drugs would be distributed and then he would return with the profits to make a bigger purchase.

About the first of April 1975 Jackson, Minder and Jefferson returned to Los Angeles and met Farmer at the Disneyland Hotel. After discussion about the amount of money that would be necessary to buy additional narcotics Minder said he would return to Washington and "put together $25,000", the minimum amount thought necessary to buy a pound of heroin.

On April 8 Farmer met with Jackson, Minder and Jefferson in a hotel in Anaheim, California. Jefferson produced a paper bag containing between $12,000 and $13,000 in small bills. The money was turned over to Farmer. Jackson said they wanted a pound of heroin but Farmer should do the best he could. Farmer in turn met with Maria the next day, and asked her to get as much heroin as she could for the $12,000 or $13,000. Thereafter Jackson and Farmer went to San Diego where they checked into the Hanalei Hotel.

2. The trial of the other defendants was severed.

From there Farmer and his brother-in-law Wells went to Tijuana, picked up a package of heroin, brought it back to the Hanalei Hotel and left it in an obscure place on the hotel parking lot. Jackson came to the lot, picked up the package, and put it in his pocket. He said he "was leaving with this shipment with Mumpsey and Jefferson."

Three or four days after the parking lot transaction Farmer telephoned to Jackson who was in Washington, D.C. Thereafter Jackson and Minder came to Los Angeles and met Farmer at the Universal Sheraton Hotel. Jackson said he had a young lady with him named Kitty, who would be taking the narcotics back to Washington. He went on to say they were having difficulties with the last shipment of drugs, that "it wasn't as strong as at first". Farmer responded that the amount they bought was "considered a very minor purchase in this area". Jackson and Minder then told Farmer they had brought one of the "big people" in the business from Washington, D.C., and they wanted Farmer to meet him. They said this man was a dealer who had "personally come out" because he thought they had diluted the narcotics they had sent him.

Farmer agreed to meet the Washington dealer who was at the Holiday Inn and who was introduced to Farmer there as Creep. Farmer identified him in court as the defendant Smith. Smith complained about the bad narcotics furnished him, that could be diluted only 2 or 3 to 1 instead of 15 to 1. He said his customers had been threatening him. He added that he had been sending all the money and he was wondering who was getting priority over him. He indicated he wanted to arrange the next transaction directly with Farmer, to be assured that he would get what he was paying for. Farmer told him it would take $30,000 or $35,000 to buy a pound of heroin. Smith responded that he would come up with it but it would take approximately a week to get rid of the narcotics he had received through Jackson and Minder. He said he had 350 people working for him "on the street." At the conclusion of the conversation he gave Farmer the telephone number of his place of business, his pool hall, and told Farmer to ask either for him or his brother.

About a week after the meeting with Smith at the Holiday Inn Jackson, who had remained in Los Angeles, made a telephone call to Smith in Washington. Smith said his brother would bring the money to San Diego. Jackson and Farmer went to San Diego where Jackson again called Smith who directed him to go to a Sheraton Hotel and pick up the money. They drove to the hotel and Jackson went in and emerged in about thirty minutes with a briefcase containing $23,000 or $24,000 in cash. Jackson then called Smith to complain that there was less than $25,000. Smith promised to make up the difference. On the following morning Farmer turned the money over to Maria who went to Tijuana to purchase the heroin. Farmer and Wells then went to Tijuana and picked up the drugs. They returned in separate cars and Wells who had the heroin was arrested at the border.

Without telling Jackson or Smith that Wells had been arrested Farmer began to stall, so he could replace the narcotics which had been seized. Having raised $4,000 he went to Maria and asked her help in replacing the lost narcotics. She agreed to help. During the waiting period Farmer checked Jackson into the Sunset Marquis Hotel in Hollywood, where he was given a weekly rate. Jackson asked Farmer to leave some money at the Universal Sheraton Hotel for Kitty, to send her back to Washington, and this Farmer did. He did not meet Kitty.

About the first of May Maria told Farmer she would have a package of drugs for him around the 7th or 8th of May. Farmer relayed this information to Jackson. On the 7th of May Farmer went to Jackson's room at the Sunset Marquis where he found Jackson and the defendant Farrell. Farrell wanted an explanation for the delay. Farmer explained that "narcotic busts" in Tijuana were the reason. Farrell said he had a right to this information, that the money was his as much as it was Smith's, that he and Smith were partners. Farmer

then went to Maria's apartment where he picked up a package of narcotics. He turned this package over to Jackson who was waiting in Farmer's car. Before they separated Farmer explained to Jackson that although he did not have a pound of heroin, "since the quality is supposed to be superb, you will have to put four ounces of cut to 12 ounces, and then you would have a pound." Later in the day Jackson telephoned to Farmer and said Farrell did not understand about cutting the heroin. Farmer explained the matter to Farrell who said he now understood.

Farmer's glowing description of his merchandise failed to satisfy Smith. Two or three days after the transaction with Farrell and Jackson on May 7 Smith telephoned to Farmer. He described "the contents of what he received back in Washington as Shake and Bake . . . something you use on chicken." Smith said he wanted to see Farmer. A day or two later Smith came to California. In the presence of Jackson he threatened Farmer and berated him for diluting the heroin.

In the last week in May Farmer received another shipment of narcotics from Maria. He reported to Smith by telephone that he had the narcotics and Smith said he would send Farrell to pick them up. When Farrell appeared a day or two later Farmer passed the drugs to him. Two days after that Smith informed Farmer by telephone that he was displeased because these drugs were also "Shake and Bake". He said he wanted to see Farmer. A day or so later Smith and Jackson met Farmer at the Holiday Inn in Los Angeles. They insisted on meeting Farmer's "contacts in Mexico" but Farmer agreed only to try to arrange a meeting. The meeting was never arranged nor did Farmer meet again with Smith or Jackson.

On September 2, 1975 Farmer was arrested on a narcotics charge. His arrest resulted from testimony his brother-in-law Wells had given before a grand jury. Farmer pled guilty to a misdemeanor, was placed on probation for one year, and became a "cooperating witness." Beginning about November 5, 1975 he was under the supervision of Special Agent Sutton of the Drug Enforcement Administration, who interviewed him many times. Information he gave resulted in the arrest and conviction of Maria Ramirez in California. On July 20, 1976 he called Farrell from the Drug Enforcement Agency offices in Los Angeles and spoke with Farrell about arranging a purchase of narcotics. This telephone conversation was tape-recorded and the tape was played to the jury. No purchase was consummated.

Farmer's account of his activities was corroborated, in part, at least, by testimony from Wells and from Lydia Jefferson. Lydia Jefferson was the wife of Willie Jefferson, one of the co-defendants not tried with the appellants. It will be recalled that Willie Jefferson accompanied Jackson and "Mumpsey" Minder at the first meeting with Farmer on March 25, 1975.

Additional and substantial corroboration appeared in the testimony of Isabelle Martin who lived with Jackson in 1975 and went with him to California in the spring of that year. She testified that when she and Jackson were at the Stage Door pool room and lounge in Washington, D.C., in April or June 1975, Jackson, after talking with Smith, told her that he had to go to California to pick up some narcotics. He said he had to go back because the last package of heroin Smith got "wasn't right", the weight wasn't right, and he had to go and make it right. Jackson said he was going to get the heroin from a man named Farmer and she was to go along and bring the drugs back to Washington. When they got to Los Angeles she and Jackson stayed at different hotels. She did not see Jackson in Los Angeles but he called her on the telephone every day. Jackson told her Mr. Farmer would leave some money for her to pay her bill. An envelope containing money was left at the desk of her hotel, but she did not see Farmer.

Martin testified that after she had been in Los Angeles for a week or two Jackson called her from San Diego and told her to join him there. She then left Los Angeles and met Jackson in San Diego. He told her that Farrell and "Black", identified as the

defendant Ridgely, were also there. Jackson said he was supposed to pick up a package of heroin in San Diego from Mr. Farmer. The transaction did not take place because Farmer "called him one day and told him . . . his connection had gotten busted or locked up." After waiting a few more days she and Jackson returned to Los Angeles where they registered at the Sunset Marquis Motel. They were there when Jackson, after receiving a phone call from Farmer, left and returned with a package of heroin. He weighed the package with measuring scales which he carried, then opened it up and she tested the heroin by snorting some of it. As an experienced addict she identified the drug as strong heroin. Shortly thereafter Ridgely and Farrell came to the motel and Ridgely telephoned to Smith to report that the weight of the package of heroin "wasn't right." Smith instructed Ridgely to return to Washington with what heroin he had while Jackson waited in Los Angeles for the balance of the shipment. Then Ridgely, Farrell and Martin flew back to Washington, Ridgely carrying the heroin. Upon arriving at Washington they went directly from the airport to the Stage Door pool room where they met Smith, and Ridgely handed him the package of narcotics.

Martin testified that at the time she returned from California in 1975 she was using heroin "and selling it and making arrangements for other people to buy it." She obtained her narcotics at the Stage Door pool room. She frequently saw Smith, Ridgely and Farrell at the pool room. She also saw the the co-defendants Frazier, a/k/a "Piggy" and Fletcher, a/k/a "Porky". She observed sales of heroin at the pool room by Porky, Piggy and others. When she inquired about the source of the drugs both Porky and Piggy told her it was "Creep's dope"—meaning that it was Smith's heroin. She was able to identify the heroin as Smith's by the distinctive way in which it was packaged. She bought heroin at the Stage Door pool room three or four times a week during 1975. She frequently saw Smith approve a sale to customers or approve the extension of credit to a customer by giving the OK sign. She also observed Ridgely making sales of heroin. She noticed that the supply of heroin was kept either in the cigarette machine or in the back of the restroom.

Continuing her testimony Martin said that during 1976 she bought drugs two or three times a week at the Stage Door pool room. Smith was there most of the time giving orders to runners and others who were selling the drugs. If Smith was not there Ridgely would give the orders. She was again told that the drugs she purchased were Smith's. On one occasion in 1976 when she asked Smith for some raw heroin he sent her to Ridgely who sold her the heroin for $250.00. On another occasion in April or May 1976 when she wanted "a quarter of scrambled dope" Ridgely told her "to see John", and John delivered the heroin to her. "Scramble" is inferior, as distinguished from pure heroin. She recalled also that when she wanted to buy on credit Smith gave his permission. She saw Farrell at the pool room, but "not as much as the others", and she saw him sell narcotics. She was told by Piggy that Farrell "was selling Creep's dope and that he was on Warner Street selling most of the time". Warner Street is five or six blocks from the Stage Door.

Martin continued to frequent the pool hall in 1977. About March or April of that year she began working for the Drug Enforcement Administration and made several "controlled buys" for the DEA at the pool hall. A "controlled buy" occurs when the purchaser is cooperating with DEA agents and under surveillance by them. The first such buy took place in May or June 1977 when she approached John (the defendant Robinson) in the pool hall and he directed her to a man named Jack from whom she made the purchase. A few days later she went back to the pool hall and told Smith she wanted a spoon of raw heroin for $250.00. Smith told her to see John. She saw John and bought the heroin from him. Her testimony concerning the controlled buys was corroborated by the agents who had her under surveillance.

Robert Crompton, a police informer, testified that during 1976 he was in the pool room almost every day, shooting pool and buying narcotics. He spent about six hours a day there. He bought narcotics and saw many other people buying them from Fat James (Henderson), Porky (Fletcher), and Piggy (Frazier). He observed that Smith was in charge of the pool hall and Ridgely appeared to be second in command. Fat James told him Smith and Ridgely paid him $5.00 or $10.00 for every bag of narcotics he sold. On perhaps a dozen occasions Crompton saw Porky counting money in amounts varying between $2500 and $6,000 and turning it over to Smith or Ridgely. The bills were separated into stacks, $100.00 in each stack. Based upon the going charges for pool of $0.40 a game or $1.50 an hour Crompton estimated the daily income from the pool tables to be not more than $60.00.

In late 1976 Crompton stopped frequenting the pool hall but he began going there and making purchases again in June of 1977. He found that Smith again was in charge, Ridgely second in command, and the runners and other workers the same as before.

Anthony Patterson, a police officer working under cover for the Metropolitan Police Department, testified that he made four purchases of narcotics at the pool hall in March and April 1977. In making these purchases Patterson would pay Henderson in the pool hall and Henderson would then get the narcotics from a nearby alley or automobile. On one occasion, April 14, 1977, Patterson rode up to the pool hall on his bicycle. He was approached by the defendant Gantt who asked if he could borrow Patterson's bike. Patterson told him that he was looking for Henderson to which Gantt replied that was why he wanted to use the bike, he was going to get something for Henderson, and if Patterson wanted "a package" he would bring it back. He told Patterson to give his money to Henderson who was in the pool room. Patterson gave Gantt the bike, then went into the pool room, told Henderson what had happened and gave him $60.00. Henderson said Gantt was all right, Gantt was his man, and

not to worry because Gantt worked for him. Presently Gantt returned on the bicycle and turned it and a bag of heroin over to Patterson.

## GANTT'S MOTION TO SUPPRESS IDENTIFICATION

Gantt filed a pretrial motion to suppress his identification by Officer Patterson. At the hearing on the motion Officer Patterson described his purchase of narcotics from Gantt and Henderson on April 14, 1977. Patterson testified that at the time he did not know Gantt's name, although he had seen him on two prior occasions. Within forty-five minutes after Gantt delivered the narcotics Patterson reported to his superior officer, Detective Johnson, who was in the area, that he had just made a purchase of heroin from "John Doe, 9, unknown", described as a black male, wearing a brown sweatsuit and approximately 40 to 45 years old. Detective Johnson promptly went to the Stage Door pool hall. Gantt was standing outside, wearing a brown sweatsuit. Johnson asked several other persons who were standing with Gantt for their identification and then asked Gantt for his. Gantt gave the officer his address, date of birth and Social Security number. With this information in hand Officer Johnson made a routine check of the police records, which disclosed no criminal record for Gantt. The officer then obtained a driver's license photograph of Gantt which he placed with five others, to make an array which he presented to Officer Patterson. Patterson "looked through the photographs" and identified Gantt as "John Doe No. 9." Patterson testified:

A. Detective Johnson gave me the photographs, told me to look at them, and see if there was anyone in there I knew or that I had dealt with or anyone that appeared familiar to me.

Q. Did he mention any specific date that you were supposed to focus in on?

A. No.

Q. In looking at those photos, did you pick out any other individuals other than Mr. Gantt?

A. No.

Q. How soon did you pick Mr. Gantt out?

A. As soon as I came across his picture.

Q. There was no doubt in your mind?

A. That is correct.

[Tr. 19, 20] This occurred on April 20.

On this appeal Gantt argues that the photographic array upon which his identification by Patterson was based "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification", in violation of Gantt's right to due process. He argues further that it was error for the court to allow Patterson to identify Gantt in court without evidence or finding that this identification was based on Patterson's original observation of John Doe No. 9, rather than his identification of Gantt's photograph.

Gantt contends that the photographic array presented to Patterson was "impermissibly suggestive" because his photograph "was the only one of the six shown to Patterson which even remotely possessed the physical characteristics of the suspect as described by Patterson." Patterson's description of John Doe No. 9, as recorded in his "buy" report was "Negro male, approximately 5′8″ to 5′9″, 170–175, dark complexion, small bush, wearing a brown warmup suit or sweatsuit. Approximately 40 to 45 years of age."

Gantt argues also that there was "seriously fluctuating testimony" by Patterson and Johnson as to the outstanding characteristics of John Doe No. 9. He refers to Detective Johnson's recollection of the brief description of John Doe No. 9 given him by Patterson, contrasted to Patterson's description, recorded in his buy report, and Patterson's added recollection that he also told Detective Johnson that John Doe No. 9 had sideburns.

■ Identification by means of photographs is an acceptable procedure, and each case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial follow-

ing a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Considering this case on its own facts, we must reject the contention that the photographic array presented to Patterson was impermissibly suggestive. Our examination of the six photographs making up the array (Govt. Exhibits 3A–3F) does not disclose that the picture of Gantt was unique among the six photographs, as he contends. The presence of only six photographs in the array was not unduly suggestive. *Manson v. Brathwaite*, 432 U.S. 98, 115–16, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *United States v. Lawrence*, 499 F.2d 962 (4th Cir. 1974); *United States v. Smith*, 546 F.2d 1275 (5th Cir. 1977); *United States v. Collins*, 559 F.2d 561 (9th Cir.), *cert. denied*, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977). Nor was the identification invalidated by the delay of six days between Patterson's buy and the showing of the array. *United States v. Smith*, 179 U.S.App.D.C. 162, 551 F.2d 348 (1976); *United States v. Hurt*, 155 U.S.App.D.C. 217, 476 F.2d 1164 (1973).

■ The District Court did not err by failing to make a finding of an independent source to support Patterson's identification of Gantt in court. Such a finding is necessary only when the photographic identification procedure has been found to be suggestive. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Hurt, supra*. In any event the record plainly would support a finding of an independent source. Patterson was not a casual or passing observer, but a trained police officer whose duty was to focus on the identification of those from whom he purchased drugs, and who knew that his observations would be subject later to close scrutiny. In addition, Gantt's face was familiar to him, for he had seen Gantt on at least two occasions before he made the purchase of

narcotics on April 14. His recognition of Gantt's face in the photograph was instantaneous and positive. *See Manson v. Brathwaite, supra,* 432 U.S. at 115.

In sum, considering the totality of circumstances we hold that the photographic identification of Gantt was not impermissibly suggestive.

## PRODUCTION OF MATERIAL BY THE GOVERNMENT

All the appellants except Gantt contend that the District Court erred in not striking the testimony of witnesses or declaring a mistrial because of the government's failure to preserve the notes made by Agent Sutton and by the untimely production of other notes. The appellants argued that the result for which they contend follows from the doctrine of *Jencks v. United States,* 353 U.S. 657, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1957), the Jencks Act, 18 U.S.C. § 3500, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971). We think however that there was no error requiring reversal.

Agent Sutton testified that he interviewed Farmer on many occasions. The first interview, lasting for two or three hours, took place in the office of Farmer's lawyer, after Farmer's arrest. This was, said Sutton, "a kind of of a feeling out or general conversation wherein he was, I guess, trying to determine the kind of people we were and, in essence, we were trying to determine the kind of person he was or would be toward being useful to the Drug Enforcement Administration." (Tr. 151) Sutton made notes of only a few names of "people out of Los Angeles and in Tijuana, Mexico" and two telephone numbers. In March 1976 he interviewed Farmer again and made notes which were incorporated in a report dated March 3, 1976 which Sutton signed. This report was furnished to the defendants. Another interview took place on April 28, 1977 when Sutton made notes which were incorporated in a report dated May 4, 1977. He identified this report in court. He testified that until "about mid-

1977" it was his practice to makes notes only "in rough form", merely giving times and locations. When his formal report had been typed and proofread his longhand draft and rough notes were destroyed. This was in conformance with the regular practice of the agency at the time. The DEA changed its practice "about mid-1977", and all notes are now preserved.

The government produced the files of the California office of the Drug Enforcement Administration on Maria Ramirez, Reginald Farmer and Harvey Wells. After reviewing them *in camera* the court turned over to the defense a letter from Agent Sutton to a prosecutor in California and handwritten notes of Special Agent Hubbard on his interview with Farmer in 1977, before Farmer's grand jury appearance. In addition, the transcript of Farmer's testimony before the grand jury was furnished to the defense.

■ It does not appear that Farmer signed or otherwise adopted or approved Sutton's notes, nor were those notes a verbatim recital of Farmer's statements. Thus, it cannot be said that the notes constituted a statement by Farmer within the meaning of the Jencks Act. 18 U.S.C. § 3500. Nevertheless, *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971) imposed upon Sutton the duty to preserve his notes. He did not preserve them. The appellants argue that because of this failure the court was required to exclude the testimony of Farmer, or declare a mistrial. The result of either of these sanctions would have been the collapse of the government's case and the acquittal of the defendants. We think however that such an extreme sanction was not required.

■ *United States v. Bryant* and later cases establish that the matter of sanctions for failure to preserve notes or other evidence is left to the discretion of the trial court. Factors to be considered are the good faith of the agent who destroyed the evidence, the circumstances of the destruction, the degree of prejudice to the defendant, and the strength of the government's

case. *United States v. Peters*, 190 U.S.App. D.C. 370, 587 F.2d 1267 (1978); *United States v. Quiovers*, 176 U.S.App.D.C. 265, 539 F.2d 744 (1976); *United States v. Carpenter*, 166 U.S.App.D.C. 358, 510 F.2d 738 (1975); *United States v. Perry*, 153 U.S. App.D.C. 89, 471 F.2d 1057 (1972); *United States v. Bundy*, 153 U.S.App.D.C. 191, 472 F.2d 1266 (1972). The imposition of sanctions for failure to produce is not automatic.

There was no evidence that Agent Sutton acted in bad faith or with any improper motive in destroying his rough notes and longhand drafts. On the contrary, he testified that he acted only in compliance with the regular practice of his agency. Although the agency may be faulted for failure to heed the admonition of *United States v. Bryant*, in the circumstances Sutton cannot be charged with this dereliction; it does not appear that he had even heard of the *Bryant* rule.

As we have said the defendants were given Agent Sutton's reports, which he testified incorporated the material contained in his notes. They were also furnished the transcript of Farmer's testimony before the grand jury, and the notes of Special Agent Hubbard on his interview with Farmer in 1977, before Farmer's grand jury appearance. Furthermore, Farmer was cross examined extensively on the basis of this material, and with respect to some matters he was impeached. Thus he testified at trial that on March 26, 1975 he passed a package of narcotics to Jackson in a restaurant booth, but cross examination disclosed that before the grand jury he testified the transaction occurred at a Holiday Inn. Again, he testified that he delivered heroin to Farrell in the latter part of May 1975 but on cross examination he conceded that he had told Special Agent Sutton this delivery was made in the latter part of July or the first part of August.

In the circumstances and in light of the overwhelming strength of the government's case we conclude that the failure to preserve and produce Sutton's rough notes and drafts does not require reversal. We decline to speculate that some item in the notes or drafts might have cancelled out all the other evidence and produced an acquittal. The *Bryant* rule requires the court to exercise a sound discretion in the matter of sanctions; it does not require us to ignore the dictates of common sense.

■ The government witness Isabelle Martin testified that she had reviewed and approved five reports by Drug Enforcement Administration agents on the controlled buys which she had made at the Stage Door pool room. These reports were furnished to the defendants. The notes of Agent Johnson on his interviews with Martin were turned over to the defense. One statement in the notes conflicted with Martin's testimony. Appellants complain however that they did not receive a portion of the notes before Martin left the stand. According to the appellants she could not be recalled for further cross examination "because of her physical condition"—she was pregnant and the arrival of her baby was thought to be imminent.

Martin testified on Friday, April 21, 1978. She was cross examined at length, the cross examination running for 74 pages of the transcript. (Tr. 741–815) At the conclusion of her cross examination she was excused and court adjourned until the following Monday, April 24. On Monday morning counsel for the defense informed the court that one statement in Agent Johnson's notes contradicted part of Martin's testimony. Specifically, the notes disclosed that contrary to her testimony Martin had told Agent Johnson she did not see any package of heroin being delivered in California and did not know who brought the package back to Washington. Counsel explained that although this statement appeared in the notes furnished to counsel while Martin was on the stand counsel then had not had time to go through the material and discover the discrepancy. There was no showing or charge of any other conflict between the notes and Martin's testimony.

The record does not support the contention that delay in the production of the Johnson notes was prejudicial error. When

the notes were produced counsel did not ask for a recess to review them. Moreover there is no showing that Martin could not have been recalled for further examination when court reconvened on Monday. She was in jail at the time, and readily accessible. No motion to recall her was made nor was there any attempt to ascertain her condition. On this record we must reject the contention of the appellants that their cross examination of Martin was unfairly foreclosed. Furthermore, when Agent Johnson took the stand he was permitted to testify on cross examination that "with respect to this package that was supposedly brought by Mr. Ridgely and the other gentleman on the airline" Martin told him in May 1977 "that she did not see the package, and did nto [sic] know who brough [sic] the package back". (Tr. 885)[3] Thus the appellants received the benefit of the conflict between the notes and Martin's testimony.

■ Appellant Jackson also complains that Agent McCoy's notes taken during an interview with Harvey Wells, which contained references to other narcotics dealings by Reginald Farmer, were not turned over to the defense until Wells testified. Jackson contends that these notes were *Brady* material and that their untimely production prevented their use to impeach Farmer. Again, the defense made no effort to recall Reginald Farmer. Furthermore, the defense was permitted to elicit evidence of these additional narcotics dealings from Harvey Wells so that the jury had the relevant facts before it.[4] We note also that the defendants were given transcripts of Wells' testimony before a grand jury in San Diego, California, and a statement in his handwriting which he had furnished to the Drug Enforcement Administration. Cross examination developed several discrepancies between statements in this material and the testimony Wells had given at trial. Jackson was not prejudiced by delay in producing the McCoy notes.

■ Appellants also say the government failed to produce the criminal records of Reginald Farmer and Isabelle Martin and to divulge adequately the plea bargains with those two witnesses. The record which we have examined with care does not support these contentions. Farmer's and Martin's criminal records were made known and were used by the defense to impeach their credibility. Martin's FBI record was not received until a day after her testimony, but there is nothing in the record to indicate that it contained any information not already known to the defense. The plea bargains made with all the witnesses were also disclosed at a pretrial hearing. The defense was fully aware that Reginald Farmer and Harvey Wells had pled guilty to misdemeanor charges in California, and it was equally clear what government concessions had been made. On cross examination the defense used the facts of these plea bargains to discredit Farmer, Wells, Martin, and Crompton, and there is no evidence that the government either failed to provide or hampered the discovery of this information.

## EVIDENCE OF STATEMENTS BY CO–CONSPIRATORS

Jackson and Farrell contend that the District Court committed error by admitting statements attributed to co-conspirators, before the court made specific findings that a conspiracy existed, that Jackson, Farrell and the persons making the statements were co-conspirators, and that the statements were made in furtherance of the conspiracy. We think however that the court did not err.

■ The admissibility of the statements of alleged co-conspirators was questioned by counsel for Jackson early in the trial, when Farmer testified to certain statements made by Mumpsey Minder. The

---

3. Johnson testified that when he interviewed Martin again in June or July of 1977 Martin's statements were in accord with her testimony. (Tr. 889)

4. In any event evidence of the other narcotics dealings did not rise to the level of *Brady* material for it was not evidence of innocence but at most was merely additional impeachment material.

transcript (Tr. 229–31) reflects that the following occurred at that time:

MR. STILLER [counsel for Jackson]: If the court please, we are getting into a position now that hearsay-type statements are being elicited about people who have not said them in this Court or who are not in this Court.

I see the Court has opened the limiting instruction. I would ask for the limiting instructions.

But I believe that the only way that, for example, Mumpsey's statements could come in would be under the co-conspirator's hearsay doctrine. And at some point the conspiracy has to be shown before—or some kind of allegation besides the indictment has to be shown of a conspiracy before this hearsay evidence can come in.

Therefore, I move to exclude that.[5]

THE COURT: Well, it doesn't work quite that way. It is received, subject to being tied up and I will give the limiting instruction at this time, if you like.

MR. STILLER: May I ask the instruction that is going to be given?

Fine.

MR. HARKINS [Prosecutor]: Could I?

THE COURT: Yes, sure.

The court then instructed the jury:

Ladies and gentlemen of the jury, you have been hearing some statements that are hearsay as regards Mumpsey, who is not in the Court at this time. I want to advise you at this time that a statement made or an act done by a person outside the presence of these defendants may be considered by the jury, if the jury finds independent evidence, beyond a reasonable doubt, that there was a conspiracy, that the person making the statement or doing the act and the defendant or defendants against whom the statement or act is used with [sic] participants in the conspiracy.

The statement made or acts done were made during and in furtherance of the conspiracy.

Now it has not been shown yet and so we are allowing you to hear this tentatively with the expectation that the Government will tie it all up. If they do not, you will hear further about it, because you just consider it if they have provided the items that we are telling you.

■ From the dialogue it is apparent that when defense counsel objected to "hearsay-type statements" by alleged co-conspirators, and asked for "the limiting instructions" with respect to such statements, the court showed him the instruction that the court proposed to give, and counsel then expressed his entire satisfaction with this disposition of his objection. By their silence counsel for the co-defendants endorsed this position. There was no request that before admitting the statements of co-conspirators against the defendants the court make findings that a conspiracy existed. In short, the defendants approved the course followed by the court; and they are hardly in a position now to complain that it was error. However, we need not rest our rejection of the defendants' complaint upon this ground alone.

■ Statements by an alleged co-conspirator may be received in evidence against the defendants on trial if there is substantial evidence, independent of those statements that (1) a conspiracy existed, (2) the co-conspirator and the defendant against whom the statement is offered, were members of the conspiracy, and (3) the statements were made in furtherance of the conspiracy. It is for the court to determine whether the requisite evidence has been produced. Fed.R.Evid. 801(d)(2)(E). *United States v. Nixon*, 418 U.S. 683, 701 & n.14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. James*, 590 F.2d 575, *en banc* (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Dixon*, 562 F.2d 1138 (9th Cir. 1977), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1494, 55

---

5. It should be noted that the statements of Mumpsey Minder on which counsel for Jackson focused were plainly admissible against Jackson, for they were made in his presence.

L.Ed.2d 521 (1978).[6] As a practical matter, to avoid what otherwise would become a separate trial on the issue of admissibility, the court may admit declarations of co-conspirators "subject to connection". If substantial evidence of the connection has not been produced at the close of the government's case the court will instruct the jury to disregard the hearsay statements; or the court may grant a mistrial. *United States v. Stanchich,* 550 F.2d 1294 (2d Cir. 1977); *United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *United States v. Greene,* 523 F.2d 229 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); *United States v. James, supra; see United States v. Ziegler,* 583 F.2d 77, 80 (2d Cir. 1978).

▬ In this case there was overwhelming proof that Jackson and Farrell were members of a conspiracy and that the statements by co-conspirators were in furtherance of that conspiracy. This proof consisted of the acts of the defendants without reference to any statements of co-conspirators. Thus there was evidence that Jackson, Farrell, Jefferson, Mumpsey Minder, Smith and Ridgely were associated and that at one time or another they all went to California and obtained narcotics from Farmer, in return for large amounts of cash turned over to him. There was evidence that these narcotics were brought to Washington and dispensed by Smith and his organization at the Stage Door pool room. Smith and Ridgely were active in making sales of heroin at the pool room. This conduct of the defendants, without regard to any statements by co-conspirators, was sufficient to justify a finding that the defendants were acting pursuant to a common design and purpose, that is, that they were members of a conspiracy. Evidence of acts

of co-conspirators of course is not hearsay; it stands on a footing quite different from evidence of their declarations. *See Lutwak v. United States,* 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *United States v. Geaney, supra,* at 1120 n.3. In the light of this proof the failure of the court to make preliminary detailed findings of the existence of a conspiracy could not have prejudiced the defendants.

▬ In submitting the case to the jury the court gave an instruction which permitted the jury to determine the admissibility of declarations of co-conspirators. As we have said, the admissibility of such declarations was a question for the court. Jackson and Farrell contend that because the judge and not the jury had the responsibility of determining the admissibility it was error to submit the matter to the jury. They argue that "the danger exists that the very introduction of the statements will have an undue influence upon the jury's determination of the existence of conspiracy." (Farrell Br. 19) The argument might be plausible if the evidence as to the existence of a conspiracy and the defendants' participation therein had been weak. In this case however the evidence was so strong that only one determination by the court was possible—the challenged declarations were admissible against the defendants. The jury's consideration of the matter was merely an added and superfluous "layer of factfinding" which did not prejudice the defendants. Indeed, the court's instruction went too far in their favor by authorizing the jury to determine admissibility, and by requiring proof of a conspiracy beyond a reasonable doubt before the declarations of co-conspirators could be considered against the defendants. We repeat, substantial evidence, not proof beyond a

---

**6.** The Court of Appeals for the Second Circuit holds that a fair preponderance of the evidence independent of the hearsay utterances is enough to make the statements of co-conspirators admissible. *United States v. Stanchich,* 550 F.2d 1294 (2d Cir. 1977); *United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). The Court of Appeals for the First

Circuit holds that there is a sufficient showing of conspiracy to permit the introduction of the statements of co-conspirators if the evidence makes the existence of conspiracy more likely than not. *United States v. Martorano,* 557 F.2d 1 (1st Cir. 1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); *United States v. Petrozziello,* 548 F.2d 20 (1st Cir. 1977).

reasonable doubt, is enough. *See United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977); *United States v. Mitchell*, 556 F.2d 371, 377 (6th Cir.), *cert. denied*, 434 U.S. 925, 98 S.Ct. 406, 54 L.Ed.2d 284 (1977).

## THE MULTIPLE CONSPIRACY ARGUMENT

Jackson and Farrell contend that although the indictment alleged one conspiracy the proof showed "two primary conspiracies, the California conspiracy and the Washington, D. C. conspiracy" (Farrell Br. 14), that there was "no connection between events in California in 1975 and events beginning in June 1976 in Washington, D. C." (Jackson Br. 40) Jackson says there was no "evidence that he had anything to do with events in Washington, D. C." (Br. 43) and Farrell avers that there was no proof that he "participated in any way in the distribution of narcotics from the Stage Door Pool Hall". (Br. 14) From these premises the appellants argue that there was a fatal variance between the indictment and the proof. Specifically, they say they were prejudiced by the evidence relating to activities at the Stage Door pool hall, with which they had no connection. The flaw in their argument is that it does not square with the allegations of the indictment and the facts shown by the evidence.

■ The indictment charged that the defendants, including Jackson and Farrell, conspired to distribute and possess with intent to distribute quantities of heroin. It was alleged that as part of the conspiracy certain of the defendants, including Jackson and Farrell, would travel from Washington, D. C. to California for the purpose of arranging purchases of narcotics for distribution in Washington, D. C.; that as a further part of the conspiracy certain of the defendants would prepare narcotics for sale in the District of Columbia, certain defendants would be in charge of the distribution of narcotics, and certain defendants would be in charge of sales. Without repeating the summary of the testimony with which we began this opinion it is enough to say that the proof fully supported the allegations of the indictment. The evidence showed a conspiracy to procure drugs and dispense them in the District of Columbia. The leader, Smith, or Smith and Farrell together, supplied capital to Jackson who obtained the narcotics from Farmer. The narcotics were then cut, packaged, and resold to customers in the District of Columbia by persons working for Smith. The activities of each member and group in the organization meshed with those of the other members and groups. In short, the evidence disclosed a classic example of a narcotics sale and distribution conspiracy. *See United States v. Bruno*, 105 F.2d 921 (2d Cir.) *rev'd on other grounds*, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939); *United States v. Rich*, 262 F.2d 415 (2d Cir. 1959); *United States v. Stromberg*, 268 F.2d 256 (2d Cir.), *cert. denied*, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); *United States v. Bynum*, 485 F.2d 490 (2d Cir. 1973), *vacated and remanded on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); *United States v. Tramaglino*, 197 F.2d 928 (2d Cir.), *cert. denied*, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952). The facts here are completely different from those in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) and other similar cases relied upon by the appellants. In those cases the evidence showed "wheel-type" conspiracies, whereas the conspiracy here was the "chain-type" conspiracy common in narcotics cases.

■ The court instructed the jury that each defendant could be convicted only if he was found to be a member of the particular conspiracy charged in the indictment; that if a defendant was found to be a member of another conspiracy, not the one charged in the indictment, he must be acquitted. The appellants requested a jury instruction that if more than one conspiracy was proven the defendants must be acquitted. This however is not the law. The court's charge was correct. *United States v. Tramunti*, 513 F.2d 1087 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Lam Leck Chong*, 544 F.2d 58 (2d Cir. 1976), *cert. denied*, 429 U.S. 1101, 97

S.Ct. 1124, 51 L.Ed.2d 550 (1977); *United States v. Taylor*, 562 F.2d 1345 (2d Cir.), *cert. denied*, 432 U.S. 909, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977).

## MISCELLANEOUS

■ Smith says he was entitled to a judgment of acquittal on Count 2 of the indictment, which charged him with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. The sole ground of his attack on the conviction is that "the government's proof did not establish the fourth essential element of this offense, that being that Milton Smith had to obtain substantial income or resources from the criminal enterprise". (Br. 8) Smith argues that the testimony of Robert Crompton, "the only government witness" who testified with respect to this matter, was "pure speculation". We do not agree.

Crompton testified that Smith was in charge of the business at the pool hall. On at least a dozen occasions Crompton saw money in amounts varying between $2500 and $6000 being counted at the pool hall and turned over to Smith or his associate Ridgely. As a regular patron of the pool hall Crompton knew that the charge for pool was $0.40 a game, or $1.50 an hour. From this he estimated that the daily income from the pool tables was not more than $60.00. This testimony was not speculation. The jury also had before it the testimony of Farmer that Smith and Jackson had turned over to him thousands of dollars in cash to use in the purchase of heroin; and the principal business of the pool hall was the traffic in heroin. From all this evidence the jury was justified in finding that Smith received substantial income from his illegal enterprise.

Ridgely contends that he was entitled to a judgment of acquittal on a count of the indictment charging him with the sale of heroin to Isabelle Martin. According to Ridgely, Martin's testimony with respect to this sale was impeached on cross examination. The record shows however that the cross examination related to another sale, not to the one which was the basis of Ridgely's conviction.

Farrell argues that he was prejudiced when the court improperly limited his cross examination of Reginald Farmer. The contention is not supported by the record.

■ Farmer testified that he made his last delivery of heroin to Farrell in late May or early June of 1975. In contrast, Farmer's grand jury testimony and his statements to DEA agents fixed the date of this delivery as late July or early August of 1975. According to the prior testimony and statements the delivery had occurred after the firebombing of Farmer's house, which occurred in July of 1975. Counsel for Farrell proposed to refer to the firebombing on cross examination of Farmer, to fix the date of the delivery of narcotics. Quite naturally counsel for the co-defendants objected and the objection was sustained. It was suggested that Farrell's counsel might refer to the bombing as a fire, without eliciting any details, but counsel did not adopt this proposal. However counsel did question Farmer about his prior inconsistent statements and he presented two agents who testified that in statements to them Farmer had fixed the date of the drug transaction as late July or early August. Under these circumstances it is frivolous to contend that Farmer was prejudiced by the exclusion of questions concerning the firebombing.

## CONCLUSION

The judgment of the District Court as to each appellant is

*Affirmed.*