627 F.2d 293
 200 U.S.App.D.C. 240, 5 Fed. R. Evid. Serv. 1053
 UNITED STATES of America
v.
John Roscoe SLADE, a/k/a "Slave", Appellant.
UNITED STATES of America
v.
Odell JOHNSON, Jr., Appellant.
UNITED STATES of America
v.
Arthur WATSON, Jr., a/k/a "Speed", Appellant.
UNITED STATES of America
v.
George Norman MARSHALL, a/k/a "Little George", Appellant.
UNITED STATES of America
v.
David REDD, a/k/a "Slim", Appellant.
UNITED STATES of America
v.
John Robert JOHNSON, a/k/a "Stampede", Appellant.
 Nos. 78-1333, 78-1409 to 78-1412 and 78-1419.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 4, 1979.
Decided March 4, 1980.
As Amended July 11, 1980.
Rehearing Denied July 11, 1980.
 
 1
 Thomas Lumbard, Washington, D. C. (appointed by this Court), for appellant in No. 78-1333.
 
 
 2
 Robert A. W. Boraks, Washington, D. C. (appointed by this Court), for appellant in No. 78-1412.
 
 
 3
 William H. Jeffress, Jr., Washington, D. C. (appointed by this Court), for appellant in Nos. 78-1410 and 78-1411.
 
 
 4
 David Niblack, Washington, D. C., for appellant in No. 78-1409.
 
 
 5
 Gordon C. Rhea, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter E. George and Barry L. Leibowitz, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.
 
 
 6
 Before BAZELON, Senior Circuit Judge, WILKEY, Circuit Judge, and PARKER,* United States District Judge for the District of Columbia.
 
 
 7
 Opinion for the Court filed by District Judge BARRINGTON D. PARKER.
 
 
 8
 Concurring opinion filed by Senior Circuit Judge BAZELON.
 
 BARRINGTON D. PARKER, District Judge:
 
 9
 In 1977, the government conducted an extensive investigation of a suspected heroin sales ring operating in Washington, D. C. The investigation, conducted by local and federal undercover agents with the assistance of paid informants, made use of concealed tape recorders and video-taping of street activities. It led to the exposure of and cracked the so-called "Stampede organization," a lucrative and financially successful retail heroin sales operation. The result was a 23 count indictment returned against eight defendants and, ultimately, multiple convictions of six. The appellants currently before this Court are John R. Slade; Odell Johnson, Jr.; Arthur Watson, aka Speed; George N. Marshall; David Redd, aka Slim; and John R. Johnson, aka Stampede (Odell and John R. Johnson are brothers); Nos. 78-1333, 78-1409 to 1412, 78-1419, respectively.[1]
 
 
 10
 The indictment, returned October 11, 1977, charged all defendants with conspiracy to distribute heroin in violation of 21 U.S.C. § 846. Each appellant was also named in one or more of the substantive counts charging distribution of or possession with intent to distribute narcotics in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2. The substantive counts closely mirror the 25 overt acts in the conspiracy count, covering transactions from April 5 to September 29, 1977. Following ten days of trial and seven days of deliberations, the jury convicted all appellants of conspiracy and convicted all but appellant Arthur Watson, of one or more substantive counts.[2] A chart listing the counts, the verdicts, and the relevant evidentiary tapes is attached as Appendix A.[3]
 
 
 11
 Appellants seek reversal of their convictions on four major grounds. They contest the propriety of the jury following audio tapes with government-prepared transcripts which had not been reviewed for accuracy by the court at pretrial. The trial judge afforded defense counsel the opportunity to submit alternative transcripts, and instructed the jurors that their independent understanding of the tapes should supersede the transcripts. Second, they challenge the trial judge's decision barring defense counsel from using the Saint Elizabeth's psychiatric hospital records of a key government witness, who was released from the hospital in 1974. Third, they allege that repeated references by government witnesses to the "Stampede organization" or the "organization" denied them a fair trial, since the references implied the existence of undisclosed proof of such an organization having appellants as members, a prejudicial implication allegedly not cured by the trial judge's instructions to the jury to ignore the references. Finally, they challenge the conspiracy instruction given to the jury. Rather than using the standard instruction that a defendant's membership in a conspiracy may be proven only by his own acts and statements, versus those of codefendants, the judge instructed the jury to determine the existence of a conspiracy "on all the evidence." Various other grounds for reversal are asserted by particular appellants.
 
 
 12
 For the reasons outlined in this opinion, none of these alleged errors, considered alone or cumulatively, warrants reversal of the several convictions. The same is true for the matters raised by individual appellants, with one exception, the Appellant Watson. We reverse the conspiracy conviction of Arthur Watson,[4] finding that he was impermissibly impeached by a misdemeanor firearms conviction not involving dishonesty.
 
 
 13
 In all other respects, we affirm the defendants' convictions.
 
 I.
 THE EVIDENCE AND PROCEEDINGS AT TRIAL
 
 14
 The government's witnesses clearly identified all appellants as members of a heroin-distribution ring managed principally by John R. "Stampede" Johnson and his brother Odell Johnson. The ring operated in the 1800 block of 7th Street, N.W., near 7th and T Streets, a neighborhood described as notorious for drug activity. The so-called "Stampede organization" displayed a degree of imagination with members described as sometimes secreting in and dealing heroin from hollowtipped walking canes. On an average day, sales were estimated at as much as $2400 an hour. (Tr. at 262, 771).
 
 
 15
 The government's investigation of the suspected drug ring began in April and continued to September, 1977. The key figures in the investigation were detective Anthony Patterson and agent Donnie Smith. They were supervised by Detective Kenneth Johnson of the Metropolitan Police Department. Patterson was a seasoned undercover policeman familiar with the 7th and T Streets area and a member of the city police force. Donnie Smith was an experienced Drug Enforcement Administration (DEA) agent. They relied heavily on two paid informants, Allen Whaley and Charles Ward. These four were the government's chief witnesses.
 
 
 16
 Both Whaley and Ward had histories of drug addiction together with extensive criminal records associated in large part with their drug addiction. The evidence showed that Whaley's use of narcotics continued through the government's investigation which led to the indictment of the appellants. Ward, on the other hand, denied narcotic drug usage in recent years.
 
 
 17
 A. Testimony of Detective Patterson and the Informant Whaley
 
 
 18
 Detective Anthony Patterson was introduced into the narcotic operations through the informant Whaley. Through this contact he met and dealt with Odell Johnson and Stampede Johnson. Patterson's testimony clearly established that from early April through April 25, 1977, he had direct personal contact with the two appellants. Through them he arranged for and made narcotic purchases, both directly and indirectly. Through one or more of those appellants he negotiated and arranged for a series of transactions. The detective's testimony supported counts 2 through 6 of the indictment and the criminal involvement of the two Johnson brothers. In the course of his testimony Patterson testified that following one heroin purchase, Bolden remarked that they would "soon see how good Stampede's dope is."
 
 
 19
 Stampede Johnson's counsel moved for a mistrial based on the detective's testimony recounting several such statements of Bolden and Patterson concerning "Stampede" dope (Tr. at 308-310) labelling certain statements hearsay and another an inadmissible statement by a person not designated as a co-conspirator. The trial judge agreed that a "worrisome situation" existed but denied the motion. At a later time Whaley also testified that he was told by Detective Kenneth Johnson, who supervised both Patterson and Smith, "to purchase some drugs from Stampede's organization." (Tr. at 617). Counsel again moved for a mistrial, claiming that the informant's testimony was prejudicial hearsay. In denying the motion the court's offer of a curative instruction was refused as inadequate. However, the prosecutor was cautioned. (Tr. at 654). On still other occasions there was reference to the "Stampede organization" and the "organization" (Tr. at 685-690). The trial court again denied that appellant's counsel's motion for a mistrial.
 
 
 20
 Defense counsel sought to discredit Whaley in every possible manner. They secured his admissions that he used heroin regularly and committed acts of larceny throughout the investigation. Under cross-examination, Whaley testified that he had been at Saint Elizabeth's Hospital from 1970 to 1974, having been found not guilty by reason of insanity on an automobile theft charge. Appellants' counsel also elicited that Whaley received outpatient medical treatment after 1974 and that he had violated medical orders to abstain from narcotic drugs. However, the court refused to afford counsel an opportunity to explore or examine in any detail on Whaley's confinement, diagnosis or treatment or to introduce his medical records, finding the latter "confidential."
 
 
 21
 B. Testimony of Agent Smith and Informant Ward
 
 
 22
 Special Agent Donnie Smith of DEA testified about his work with informants Ward and Whaley. The testimony of Smith and Informant Ward gave particular support to the charges against the Johnson brothers in counts 7, 8 and 9 and specifically against Stampede Johnson and George Marshall on the transactions set forth in count 21 of the indictment. The prosecution's proof on count 21 was supported by a video-tape recording. The tape was shown to the jury and Ward narrated the transaction recorded on film and identified the appellants Marshall, Redd and Stampede Johnson.
 
 
 23
 Ward and Smith first appeared in the 7th and T Streets area in early May and were engaged in gathering evidence for several weeks. After a lapse of time they reappeared around the first of September. On this occasion, Ward was provided with a recording device worn under his shirt. Ward and Smith made a number of purchases from Stampede Johnson during this period implicating defendants Watson, Marshall, Redd and Jones as well as the Johnson brothers in a number of transactions. Ward and Smith detailed these sales and observations made at these times in testimony supporting a number of substantive counts. Following each drug sale, a report was prepared. Ward admitted that he did not personally prepare the statements he signed; Smith filled in many of the specifics. DEA agents also prepared the transcripts of the tape recording which Ward relied upon in his testimony. Ward testified as to the accuracy of the transcripts.
 
 
 24
 During his testimony, agent Smith, as had other witnesses, made references to "Stampede's organization" which led to a motion for mistrial by Stampede Johnson's counsel. The trial court denied the motion and later instructed the jury with regard to these statements.
 
 1. Impeachment of Informant Ward
 
 25
 Counsel for Stampede Johnson cross-examined Ward extensively about his drug addiction. He admitted use of heroin and methadone between 1972-76, spending up to $500 a week on heroin while receiving a substantial percentage of his income from DEA. However, he failed to disclose his involvement in illicit drug purchases to the DEA agents. Defense counsel questioned Ward about drug purchases he had made with friends in the 7th and T Street area during the Stampede organization investigation. (Tr. at 507). When asked by the prosecutor whether Ward had purchased narcotics in that area prior to his role as an informant, Ward replied that he had bought drugs from "Slade." (Tr. at 591). Counsel for defendant Jones objected because the question concerned a time before the conspiracy. While the court sustained the objection, the motion for a mistrial was denied. (Tr. at 606).
 
 
 26
 Ward was a very important prosecution witness and he was cross-examined vigorously and a restriction on additional examination was imposed. Although the court limited cross-examination by Johnson's counsel to 45 minutes, defense counsel was allowed to inquire further when his time had elapsed. Johnson's counsel inquired into Ward's criminal record in an attempt to show that after being charged with a felony, a six-month term was obtained with DEA assistance and that arrangements had also been made for the dismissal of certain charges pending against Ward in Virginia. Ward denied that charges were dismissed due to intervention by DEA authorities.
 
 
 27
 2. Use of Recording Devices and Tape Transcripts
 
 
 28
 The government provided the two informants with concealed mechanical devices which recorded the conversations and negotiations for drug purchases which they had with several of the appellants. Guilty verdicts on several counts arising from the recordings were returned against Stampede Johnson, Slade and Redd.
 
 
 29
 Following testimony as to how the tape recordings were electronically enhanced to remove background noise, the recording was played for the jury. (Gov't Ex. 10). The prosecution also provided the jurors with a prepared written transcript of the recording. (Gov't Ex. 11). The transcript was not entered into evidence. At the same time the following instruction was given by the trial judge:
 
 
 30
 (T)his paper that has been handed to you is the government's interpretation of what appears on these tapes. However, you will listen to the tapes very carefully and make your own interpretation of what appears on the tapes from what you hear. If you think you hear something differently than the government has interpreted on this paper, then you will follow your own interpretation. (Tr. at 482).
 
 
 31
 The transcript revealed that portions of the tape were largely unintelligible. The prosecution skipped over large portions of this tape and all subsequent tapes entered into evidence, because of sections identified in the transcripts as "street," "background," or "unidentified" noise.[5]
 
 C. Additional Prosecution Witnesses
 
 32
 Other members of the Metropolitan Police Department corroborated the informants' testimony and also offered testimony on actual drug seizures from various locations, connecting the seized drugs with a particular defendant. Expert witnesses in the field of analytical chemistry gave testimony on the technique and procedures of analysis and identified the substances purchased and seized as heroin. Expert fingerprint analysts identified the appellant Watson's fingerprints on several tinfoils in which heroin was wrapped. A DEA agent qualified and testified as an expert witness on drug trafficking and sales on the public streets. He described the typical organization of a narcotics ring and defined the roles of the several participants such as the leader, who does not touch the drugs; the lieutenant, who arranges the transactions; and the runners, who pick up and distribute drugs.
 
 
 33
 Detective Kenneth Johnson prepared the transcripts of the several tapes made by Ward and Whaley. In testifying he attributed names to certain voices by direct references, but depended on the informants to identify other voices on the tapes. At any rate, he testified that by the time the final typed copies of the transcripts were given to the informants to review, the names of the speakers were alongside the conversations. (Tr. at 1512).
 
 
 34
 A final prosecution witness, Thurston Shrader, became acquainted with appellant Stampede Johnson a few weeks before trial. At that time both were inmates at the D.C. Jail. He testified in some detail as to various admissions and inculpatory statements of Johnson (Tr. at 1359-63) which supported the charges in the indictment.[6] Shrader contacted the United States attorney himself, offering assistance in the hopes of mitigating his own three year sentence for misprision of a felony and, presumably, any punishment for pending embezzlement charges.[7] There was no indication that Shrader operated as a "plant" in any contact with the prosecution or the police.
 
 D. The Defense Evidence
 
 35
 Appellants Stampede Johnson, Odell Johnson, John Slade and George Marshall did not testify or offer any testimony or evidence.
 
 
 36
 Appellant Arthur Watson took the stand, identified himself as a 31-year-old part-time truck driver, and testified that he frequented the establishments in the 1800 block of 7th Street. He knew Odell Johnson from childhood and was acquainted with all other defendants. He denied the testimony of the informant Ward, attributing to him the nickname "Speed," or that he had a beard before October, 1977. While he admitted knowing Allen Whaley, he denied ever seeing Ward or ever having sold narcotics to either. He could not explain how his fingerprints happened to appear on tinfoils of drugs recovered in the investigation and admitted in evidence at the trial.
 
 
 37
 On cross-examination, the prosecutor asked Watson whether he had been convicted in May, 1976, of carrying a dangerous weapon, specifically a gun. (Tr. at 1591). Watson replied in the affirmative. His counsel moved for a mistrial claiming improper impeachment on a misdemeanor gun charge, having no connection to credibility. (Tr. at 1591). The motion was denied and the prosecutor did not pursue the questioning. Watson did not receive his requested opportunity to explain the circumstances of the conviction. Only the next morning did the court instruct the jury to disregard the fact that Watson was convicted of a misdemeanor gun charge when considering his credibility, since the gun conviction did not involve dishonesty or a false statement. (Tr. at 1721).
 
 
 38
 Appellant David Redd, a clerk typist at the Pension Benefit Guarantee Corporation since 1976, called his supervisor who gave alibi testimony that he was at work on September 29, 1977. A co-worker testified that he drove Redd to the area that day during lunch hour and waited one half hour while Redd bought heroin for himself. A supervisor at the D.C. Superior Court Narcotics Treatment Administration Office testified that the 7th and T area has a reputation as a place where drugs can be easily purchased, and that it was common knowledge that addicts pooled their money to purchase large quantities of drugs to get more for their money.
 
 
 39
 Finally, Redd himself took the stand and testified that he had been an addict before starting a methadone program, and frequented the 1800 block of 7th Street N.W. According to Redd, he socialized in the area but did not buy drugs from Whaley. He recognized himself on both the audio and video tapes of September 29, but stated that Whaley gave him money to pool in order to buy heroin for the two of them.II.
 
 LEGAL ANALYSIS
 
 40
 A. Prosecutor's Use of Tapes and Transcripts
 
 
 41
 The major objection presented by all appellants is that the trial judge permitted the jury to listen to the largely inaudible tape recordings of Whaley's and Ward's drug purchases. To facilitate an understanding and so that the jury could follow the tapes with a minimum of difficulty government-prepared transcripts were shown to the jury but never admitted into evidence. We conclude that while better procedures could have been adopted for dealing with and presenting the tapes and transcripts during trial, the court's rulings do not constitute reversible error.
 
 1. Tape Recordings
 
 42
 Admission of tape recordings at trial rests with the sound discretion of the trial court. Monroe v. United States, 98 U.S.App.D.C. 228, 234, 234 F.2d 49, 55, cert. denied, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956).
 
 
 43
 The first criterion for admission is that the tapes be authentic, accurate and trustworthy. United States v. Haldeman, 181 U.S.App.D.C. 254, 330, 559 F.2d 31, 107 (1976), cert. denied sub nom, Mitchell v. United States, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). There is no serious dispute here as to the authenticity of the original tape recordings or the electronically-filtered copies played in court. The government presented extensive testimony as to the collection and custody of the original tapes, see, e. g., United States v. McMillan, 508 F.2d 101, 104 (8th Cir.), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1974), as well as the techniques used in the electronic enhancement. The testimony showed that the enhanced copies, which lowered or deleted background noise, had been compared to the originals for accuracy by an experienced FBI technician and Detective Kenneth Johnson. Fountain v. United States, 384 F.2d 624, 631 (5th Cir. 1967), cert. denied, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); United States v. Knohl, 379 F.2d 427, 440 (2d Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). Both sets of tapes were entered into evidence.
 
 
 44
 A second criterion for admission is that the tapes be audible and comprehensible enough for the jury to consider the contents. The appellants challenge the procedure and merits of the trial judge's decision, made without listening to the tapes out of the jury's presence, to admit allegedly unintelligible tape recordings.[8] As to the procedural objections, an alternative course would have been for the trial judge to verify the audibility of the tapes at pretrial rather than waiting to hear the tapes for the first time when played before the jury. Monroe, 98 U.S.App.D.C. at 234, 234 F.2d at 55; United States v. Lemonakis, 158 U.S.App.D.C. 162, 170, 485 F.2d 941, 949 (1973), cert. denied, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); Springer v. United States, 388 A.2d 846, 853 (D.C.App.1978). However, the lack of such a preliminary examination is not in itself ground for reversal. United States v. Bryant, 480 F.2d 785, 789 (2d Cir. 1973).
 
 
 45
 As to the merits, there is no question but that parts of the recordings were inaudible. The judge himself commented at times that he could not understand a word of several sections. Tapes are admissible, however, unless "the unintelligible portions are so substantial as to render the recording as a whole untrustworthy." Monroe, 98 U.S.App.D.C. at 234, 234 F.2d at 55; United States v. Jones, 540 F.2d 465, 470 (10th Cir. 1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977). This was not the case here.
 
 
 46
 Indistinct portions were clarified by a second playing and the jury listened to the tapes again during deliberation. See, e. g., Bryant, 480 F.2d at 790. The court, jurors, and counsel indicated, when asked, that they had understood relevant sections played. (Tr. at 638, 640, 644). The tapes were sufficiently clear to allow the prosecutor and counsel for defendant Jones to reach general agreement on transcripts. The tapes were narrated by Ward and Whaley and, as this Court found in Monroe, supra, problems caused by poor quality tapes are minimized when "the witness who heard the statements recorded also testifies, so that the recordings give independent support to his testimony." 98 U.S.App.D.C. at 234, 234 F.2d at 55. While appellants refer to Ward and Whaley as unreliable witnesses, the credibility issue was for the jury. Finally, though this raises another issue addressed below, the jurors had the benefit of transcripts to guide them past the background noise and irrelevant conversation. Given all these factors, the trial court did not abuse its discretion in admitting the tape recordings into evidence and allowing the enhanced copies to be played for the jury.
 
 2. The Prepared Transcripts
 
 47
 Voicing objections that are somewhat parallel though more serious than those raised in connection with the actual tape recordings, the appellants challenge the propriety of the jurors' use of the government-prepared transcripts. While the transcripts were not admitted into evidence, the jurors followed the transcripts while listening to the tapes during the trial. Given the poor quality of the tapes, we assume the jury made substantial use of the transcripts. Beyond the predictable allegations that the transcripts were inaccurate, appellants Redd and Slade claim that the transcripts served as an indirect and unconstitutional method of identifying them as participants in heroin sales.
 
 
 48
 It is within the trial court's discretion to allow the jury to use an accurate transcript "to assist them in listening to (a) tape." McMillan, 508 F.2d at 105; Springer, 388 A.2d at 853. The need for a transcript tends to arise where, as here, portions of a tape were relatively inaudible and the identity of speakers was not automatically clear to a listener. United States v. Onori, 535 F.2d 938, 947 (5th Cir. 1976); McMillan, 508 F.2d at 105; United States v. Hall, 342 F.2d 849, 853 (4th Cir.), cert. denied, 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965). Because a transcript is only meant to be a guide to evidence the tape being played it is important that the judge instruct the jurors that their personal understanding of the tape supersedes the text in a transcript. Onori, 535 F.2d at 949; McMillan, 508 F.2d at 106. Appropriate instructions were given whenever a tape was played, and this is not disputed. (Tr. at 482, 636, 668, 678, 691, 716).
 
 
 49
 The ideal procedure for testing accuracy is to have the prosecution and defense attorneys stipulate to a transcript. McMillan, 508 F.2d at 106; Onori, 535 F.2d at 948; Bryant, 480 F.2d at 791. When they cannot agree as to what is on tape, the second best alternative is for the trial court to make a pretrial determination of accuracy by reading the transcript against the tapes. Springer, 388 A.2d at 853-54. In either situation the jury receives a transcript, certified as a correct version of the tape. A third alternative is to present the jury with two transcripts, containing both sides' versions, and let the jury determine which is more accurate. Onori, 535 F.2d at 948-49. In this situation, because no one transcript is presented as "correct," the judge "need not necessarily listen to the tapes or pass on the accuracy of any transcript." Id.
 
 
 50
 In these cases, the defense counsel vigorously challenged the accuracy of the transcripts, largely because the tapes from which they were made were poor. Rather than comparing the tapes and transcripts at pretrial,[9] the court invited the defense counsel to submit their own transcripts. As discussed above, this ruling was not per se an abuse of discretion. Onori, 535 F.2d at 948-49. It is certainly not judicial error that defense counsel did not or could not utilize the opportunity. Id.[10]
 
 
 51
 Under the circumstances, the Court finds that the jury's access to government-prepared transcripts was not reversible error, for two reasons. First, through defense objections and the court's cautionary instructions, the jury was made aware that the transcripts offered only the government's interpretations. The repeated instructions served to eliminate any prejudice that may have resulted from discrepancies between tape and transcript. Bryant, 480 F.2d at 791. There is no evidence that the tapes were so poor that the jurors could not compare the tapes and transcripts and that the transcripts became in effect the real evidence.
 
 
 52
 Second, the record provides substantial support for the relative accuracy of the transcripts. Detective Kenneth Johnson testified concerning the preparation of the transcripts. See, e. g., Bryant, 480 F.2d at 790-91. He developed preliminary drafts from the original tapes, identifying the informants from personal knowledge and other voices by references. Johnson then would play and review the tapes with the informants to determine who was talking. Both informants testified that the enhanced tapes and transcripts corresponded accurately. (Tr. at 396-97, 635). Finally, while the tapes were played in court, the informants identified the speakers and explained what was taking place.
 
 
 53
 Appellants Redd and Slade raise an additional objection to the transcripts, based on what they view as "a highly suggestive identification process."[11] They contend that government agents actually identified the voices on the tape by supplying drafts with names to the informants, a procedure they claim to be more prejudicial than the single photograph identification struck down in Mason v. United States, 134 U.S.App.D.C. 280, 286, 414 F.2d 1176, 1182 (1969).
 
 
 54
 The record simply does not support this due process argument. The informants did have an active role in identifying voices for the transcripts. There is no question of their competence to identify the voices.[12] There was evidence that Whaley had substantial connections with Stampede Johnson, Slade and Redd the appellants convicted on counts involving conversations taped by Whaley from times before the investigation.[13] Fountain, 384 F.2d at 632. See also McMillan, 508 F.2d at 105. The agents' testimony and the videotape corroborated the voice identifications.
 
 
 55
 In sum, while the identification process was not perfect, due in large part to the poor quality of the original tapes, the process in no way violated appellants' constitutional rights. Nor is a remand required on grounds that the presence of names in the transcripts "suppl(ied) ersatz corroboration of testimonial identification."[14]
 
 
 56
 B. The St. Elizabeth's Hospital Records of Informant Allen Whaley
 
 
 57
 Prior to Whaley's cross-examination the defense announced its intention to offer the records of that informant's confinement for mental illness at St. Elizabeth's Hospital. Objections were presented by the prosecutor on grounds that Whaley had been released prior to his activities as an informant. The court ruled that the record was "confidential" and would not be admitted into evidence. (Tr. at 859).
 
 
 58
 Counsel were allowed to establish only that Whaley was at St. Elizabeth's from 1970 to 1974 after a finding of not guilty by reason of insanity to a burglary charge; that he was in an outpatient treatment program in April, 1976, when he was found "socially rehabilitated;" and that he was under medication only on a limited basis. The court did not allow defense counsel to inquire of any diagnosis or treatment received or to use the hospital report to impeach his claim that he never used LSD.
 
 
 59
 Given the importance of Whaley's testimony to the government's case and his uncertain credibility, the appellants contend that the trial court's restriction of cross-examination into his medical records was reversible error.[15] The government argues that the court made a "proper balance of their marginal probative worth and their high potential for prejudice and confusion."[16]
 
 
 60
 However, the trial court did not attempt to strike any balance between the relevance and potential prejudice of the evidence, but rather pronounced the records "confidential" without explanation. This ruling was an abuse of discretion. Rule 403, Fed.R.Evid. Nowhere in the record did anyone raise the privilege of confidentiality, and the appellants' views on the privilege are nowhere fully aired.
 
 
 61
 It is not necessary to make a determination whether the St. Elizabeth's records or their contents were admissible, a task made impossible by the paucity of the record. For purposes of this appeal, we assume that Whaley's mental health history was relevant to his credibility as a witness to 1977 events. Sinclair v. Turner, 447 F.2d 1158, 1162 (10th Cir. 1971), cert. denied, 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590 (1972). The court also assumes that this relevance outweighed any personal harm that would be caused by disclosing this history, United States v. Honneus, 508 F.2d 566, 573 (1st Cir. 1974), cert. denied, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), and that appellants had a right to cross-examine him in detail about his St. Elizabeth's records to attack his credibility. United States v. Partin, 493 F.2d 750, 763 (5th Cir. 1974), cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1978). Even so, on the basis of Whaley's complete testimony, the trial court's refusal to admit details of his St. Elizabeth's stay is not reversible error.
 
 
 62
 The jury knew, courtesy of the prosecutor, that Whaley was an addict and a thief who was paid for informing on his friends. During an extensive cross-examination, Whaley admitted that he continued to use heroin and commit larceny throughout the investigation, that he had an extensive criminal record, and that he hoped to avoid imprisonment by cooperating with DEA. The jury learned that Whaley was committed to St. Elizabeth's mental hospital for criminal insanity in 1970, remained there for four years, and was treated as an outpatient for two more years. Defense counsel elicited the fact that Whaley resumed his heroin habit after release against doctors' orders. Given all this evidence, the Court cannot find that details about Whaley's mental illness, or additional impeachment by reference to statements he may have made to St. Elizabeth's doctors about LSD use, would have significantly affected the jury's evaluation of his credibility or swayed the verdicts. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).
 
 C. References to Stampede's Organization
 
 63
 In this conspiracy the prosecution was obligated to prove that John "Stampede" Johnson, assisted by his brother Odell, managed an organization selling heroin. All the substantive counts involve purchases from the organization. It is indisputable that the street term "Stampede's organization" was the equivalent of the legal term "conspiracy." Nor could one dispute that the ultimate question for the jury was whether such an "organization" existed.
 
 
 64
 Appellants therefore all objected to repeated references by the several government witnesses to "Stampede's organization" or "Stampede's dope." In addition to raising hearsay objections, they argue that the witnesses thereby implied that the police had evidence beyond that introduced at trial that such an organization existed, in contravention of United States v. Hilliard, 186 U.S.App.D.C. 312, 569 F.2d 143 (1977). They contend that the trial court's lukewarm reprimands to the prosecutor[17] and the belated instructions to the jury to disregard such references did not temper the inherent prejudice.
 
 
 65
 We disagree with the government's characterization of such references as having been "occasional" and "spontaneous." The remarks appear at several points in the record. They are highlighted by defense motions for mistrial, all denied.
 
 
 66
 These comments were unnecessary since each witness could just as easily have testified to a purchase of narcotics or plans to meet with Stampede Johnson. Additionally, they were improper since they essentially constituted the legal conclusion that a heroin distribution conspiracy existed. The prosecutor admitted as much when he justified such a reference as opinion evidence by "a witness who is familiar with how the operation works." (Tr. at 652). The problem with this explanation is that Smith, Patterson, Whaley and Ward were not expert witnesses, nor was a foundation laid for lay witness opinion testimony under Rule 701, Fed.R.Evid.
 
 
 67
 Despite the argument of appellant Stampede Johnson, there is no evidence that the prosecutor deliberately elicited the phrase "organization" from his witnesses. Once the improper statements were made, the court gave appropriate instructions to the jury to ignore them. (Tr. at 973-74).
 
 
 68
 While the several references to "Stampede's organization" in the record are unfortunate, they do not create a "campaign of suggestion" equivalent to that in United States v. Hilliard, supra, where the defendant was indicted under the aka "Meatball" for armed robbery of a postal employee. The government presented substantial testimony against a subject named "Meatball," but no admissible evidence that Hilliard was ever known as "Meatball." The Court reversed the conviction, finding that
 
 
 69
 the inevitable result of the prosecutor's repeated questions and references to Meatball and the suspect discovered by the investigation was to splash the defendant with damaging matter that was not in evidence.
 
 
 70
 186 U.S.App.D.C. at 315, 569 F.2d at 146.
 
 
 71
 In comparison, the prosecution here presented substantial independent evidence of the crimes charged in the indictment. The extensive testimony, augmented with audio and video tapes, clearly showed that appellants were participants in a heroin sales network operating under Stampede Johnson's direction.[18] The references to "Stampede's organization" did not insinuate the existence of substantive evidence that was not presented to the jury, but rather that government agents at the start of the investigation had some reason to believe that a ring involving Stampede Johnson was selling heroin. The references were almost always made in the context of a government agent and/or an informant starting out on some new phase of the investigation. It is not incumbent on the government to prove why it suspected a conspiracy, but only that a conspiracy existed and the named defendants were members.
 
 
 72
 The references were unnecessary since the jury could presume as a matter of common sense that the government had some basis to investigate this group of defendants. Viewing the overwhelming substantive evidence in this case, it is also a matter of common sense that the specific references to "Stampede's organization" did not shape the jury's thinking or cause the jury to find a conspiracy among the appellants. Applying the standard applied in Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) we cannot find that the judgment was "substantially swayed" by the error and therefore will not reverse the convictions on this ground.
 
 D. The Challenged Conspiracy Instruction
 
 73
 The trial court gave the following jury instruction as to the evidence that may be considered in determining a particular defendant's membership in the alleged conspiracy:
 
 
 74
 Now, as to participation in the conspiracy. Once satisfied that the conspiracy charge(d) existed, you must ask yourself who its members were. In deciding whether a defendant on trial before you was a member of the conspiracy, you should consider whether on all the evidence, that defendant knowingly entered the conspiracy and was a willing participant. (Emphasis added.) (Tr. at 2140).
 
 
 75
 In doing so the court accepted the government's requested charge, rather than the defense's requested instruction for conspiracy in the "Redbook," Young Lawyers Section, D.C. Bar, Criminal Jury Instructions 302 (3d ed. 1978).[19] The Redbook instruction provides:
 
 
 76
 In determining . . . whether (the) (a particular) defendant was knowingly a member of the conspiracy, if such a conspiracy existed, you may consider only his own acts or statements. A defendant cannot be bound by the acts or statements of other participants unless or until it is established that a conspiracy existed and that the defendant was one of its members. (Emphasis added).[20]
 
 
 77
 Unlike the Redbook instruction, the instruction actually given allows the jury to consider hearsay statements of a co-conspirator in determining the membership of a particular defendant in the conspiracy.
 
 
 78
 Since the 1976 revision of the Federal Rules of Evidence, most of the circuits have expressly held that the judge, not the jury, is to determine the admissibility of alleged co-conspirator statements. United States v. James, 590 F.2d 575 (5th Cir.), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); United States v. Santiago, 582 F.2d 1128, 1133 (7th Cir. 1978); United States v. Bell, 573 F.2d 1040, 1043-45 (8th Cir. 1978); United States v. Martorano, 557 F.2d 1, 11-22 (1st Cir. 1977), cert. denied, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed. 515 (1978); United States v. Stanchich, 550 F.2d 1294 (2d Cir. 1977); United States v. Trowery, 542 F.2d 623, 626-27 (3d Cir. 1976), cert. denied, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). These courts have treated the question of the admissibility of co-conspirator statements under Rule 801(d)(2)(E), Fed.R.Evid., as one of competence under Rule 104(a), requiring the court to make the preliminary determination of the admissibility of potentially prejudicial evidence. See, e. g., James, 590 F.2d at 579-80; Santiago, 582 F.2d at 1133. The court therefore bears the responsibility of determining whether the evidence of conspiracy and its membership is strong enough to allow the jury to consider the co-conspirator statements.
 
 
 79
 This court recently joined this trend in our decisions in United States v. Gantt, 617 F.2d 831 (D.C.Cir. 1980) and United States v. Jackson, 627F.2d 1198, (D.C.Cir., 1980). These two cases require the trial judge to determine the existence of a conspiracy and the defendant's participation in that conspiracy by "substantial independent evidence" before permitting the jury to consider the challenged co-conspirator statements in its deliberations. See Jackson, at 1219 of 627 F.2d; Gantt, at ---- of 617 F.2d. They also require the trial court to find by substantial independent evidence that the co-conspirator statements were made in furtherance of the conspiracy in which the defendant participated. See Gantt, at 845 of 617 F.2d. The preferred practice is for the trial court to make these determinations before the hearsay evidence is admitted. The court retains discretion, however, to admit particular co-conspirator statements conditioned on a later showing of substantial independent evidence of the three prerequisites for their admission. See Jackson, at 1218 of 627 F.2d.[21] A fair implication of these cases is also that where the trial judge has made the required preliminary determinations, and decided that the hearsay statements are admissible, he may charge the jury to consider the defendant's substantive guilt based upon "all the evidence" presented. See Gantt, at 845 of 617 F.2d. The trial record reflects no analysis or even awareness of the goals behind the Rule 104(a) competency approach. This Court cannot assume, despite the government's argument, that the judge implicitly made the requisite initial determination of admissibility of co-conspirator statements.[22] Without such a determination, the judge's use of the "all the evidence" instruction is questionable. The underlying premise for the "all the evidence" instruction is that the trial judge has previously made an independent determination that the co-conspirator statements included in that evidence are admissible. See Gantt, at 844 of 617 F.2d. Especially in the instant cases, which were marred by reference to "Stampede's organization," we are disturbed by the trial judge's use of the "all the evidence" instruction with no indication that he made the requisite preliminary determinations of admissibility.
 
 
 80
 Despite the foregoing, the evidence of guilt was overwhelming, substantially in the form of tapes and independent evidence against each appellant. Co-conspirator statements and references to "Stampede's organization" were not a significant part of the prosecution's case. Only two appellants here point to potentially damaging co-conspirator hearsay. As we today reverse the conviction of appellant Watson on other grounds,[23] we need not reach the prejudice to him from the instruction error. As for appellant Marshall, we find that he was not prejudiced by the instruction error. He was convicted only on the count for which a video-tape documented the offense. The jury apparently was able to consider Marshall's role as distinguished from the totality of evidence; the jury acquitted Marshall of the four other charges against him. See Appendix A.
 
 
 81
 The several appellants' convictions on the conspiracy count, based on the given jury instruction as to conspiracy membership, will not be disturbed.
 
 E. Improper Impeachment of Arthur Watson
 
 82
 Of the several challenged convictions presented in this appeal we find merit only in the claim of the appellant Watson. He was the victim of improper impeachment and his conviction on the conspiracy count should be reversed.
 
 
 83
 On cross-examination, the prosecutor impeached Watson with a misdemeanor conviction for possessing a pistol without a license, 22 D.C.Code § 3204. The court denied a mistrial motion, and gave a cautionary instruction only the next day and in final instructions.
 
 
 84
 This impeachment was clearly improper under Rule 609(a), Fed.R.Evid., which allows use of a prior conviction to impeach a witness only if the crime 1) was punishable by death or imprisonment for more than one year or 2) involved dishonesty or a false statement. The crime of carrying a pistol without a license is not one that may be used for impeachment. United States v. Millings, 175 U.S.App.D.C. 293, 535 F.2d 121 (1976). See also United States v. Dorsey, 192 U.S.App.D.C. 313, 591 F.2d 922 (1978).
 
 
 85
 Since this error does not reach constitutional dimensions, United States v. Smith, 179 U.S.App.D.C. 162, 180, 551 F.2d 348, 366 (1976), the question on appeal is whether the impeachment was more than harmless if the Court, looking at the case as a whole, can "say, with fair assurance, . . . that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).
 
 
 86
 The Court cannot make such a statement here. The jury did not believe most of the evidence against Watson. He was acquitted of four substantive counts. The two informants were the principal prosecution witnesses on those counts and Ward's identification was not the strongest. (Tr. at 571-72 and 1566). The proof on one of the counts also included expert testimony that Watson's fingerprints were on a tinfoil of drugs.
 
 
 87
 The four counts covered four of the six overt acts naming Watson in the conspiracy count. Two overt acts concerned meetings with informant Allen Whaley in early September, 1977. In the final analysis, the jury had to balance Whaley's testimony plus evidence that Watson's fingerprint appeared on a tinfoil recovered from the tree against Watson's testimony that he frequented the area for innocent reasons, in part because he was friendly with other defendants. Whaley was not the most credible witness. The fingerprint evidence could not have been weighty, since Watson was not indicted in connection with the cache of heroin in the tree.
 
 
 88
 Under these circumstances, the Court cannot find that the jury was not ultimately swayed by the improper evidence of Watson's misdemeanor gun conviction to convict him of conspiracy. See Millings, 535 F.2d at 121; Smith, 179 U.S.App.D.C. at 179, 551 F.2d at 365-66. Compare United States v. Belt, 169 U.S.App.D.C. 1, 514 F.2d 837 (1975). This is especially so where an attempt at a curative instruction did not come until the day following the testimony. United States v. Carter, 157 U.S.App.D.C. 149, 151-52, 482 F.2d 738, 740-41 (1973). In fact, because the judge repeated the impermissible testimony about Watson's gun possession conviction in making the instruction, the prejudice was highlighted and likely compounded.
 
 
 89
 Examining this record as a whole we find that the impeachment of Watson's credibility with a misdemeanor gun conviction was reversible error. His conspiracy conviction is reversed and his case is remanded for a new trial.
 
 III.
 ADDITIONAL LEGAL ISSUES PRESENTED
 
 90
 Other issues have been raised by the appellants. While they warrant some comment, in no event are they grounds for reversal of any conviction.A.
 
 
 91
 Appellant Stampede Johnson contends that his Sixth Amendment confrontation rights were violated when cross-examination of government witnesses Charles Ward and Thurston Shrader was restricted by the trial court. Following several questions about Ward's drug usage, his paid informant status, and a sentence for a prior conviction, further examination was limited to 45 minutes. Specifically his counsel was denied opportunity to discover the identity of certain associates of Ward's at the time of a particular drug purchase.
 
 
 92
 A trial judge may and must exercise discretion to limit cross-examination into collateral matters. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Howard v. United States, 128 U.S.App.D.C. 336, 341, 389 F.2d 287, 292 (1967). While the time limitation may have placed a degree of pressure on Johnson's counsel, who then indicated that the schedule interfered with his preparation and concentration, under the circumstances of these cases and the matters explored, the restriction of cross-examination was not an abuse of discretion or prejudicial. See Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931).
 
 
 93
 The fact remains that counsel conducted a long and thorough cross-examination of Ward. We cannot find that the limitations on the cross-examination were sufficiently disconcerting or substantively improper to call for reversal on constitutional grounds. See United States v. Pugh, 141 U.S.App.D.C. 68, 72, 436 F.2d 222, 226 (1970); Howard, 128 U.S.App.D.C. at 341, 389 F.2d at 291-92.
 
 
 94
 Appellant also raises a Sixth Amendment challenge because of restrictions in the cross-examination of Thurston Shrader, a white prisoner held at the D.C. Jail. Counsel was granted full opportunity to discredit Shrader and otherwise to lay bare Shrader's obvious self-motivation to shorten his jail time by producing "good" evidence. The trial court properly sustained the prosecutor's objections and was warranted in limiting further questioning when it appeared that tangential matters were being explored.
 
 B.
 
 95
 Appellant Slade alleges reversible error because on redirect examination by ant Ward identified him as having sold narcotics at the prosecution, the informant Ward identified him as having sold narcotics at a time prior to the conspiracy. Slade was not charged in the indictment with that particular sale. Objection to Ward's testimony was sustained by the trial court and a motion for a mistrial was denied. (Tr. at 591-606). Rule 404(b), Fed.R.Evid., providing for the inadmissibility of prior bad acts, was applicable here.
 
 
 96
 However, we do not find Ward's statements sufficiently prejudicial to disturb Slade's conviction. Both informants Ward and Whaley testified against Slade on various counts of the indictment. As it developed it appears that the jury was not convinced by any of Ward's testimony against Slade. No convictions on the distribution counts against the appellant were based on Ward's testimony. The other evidence presented against Slade was substantial, was properly submitted to the jury, and resulted in convictions on four substantive counts as well as the conspiracy.
 
 C.
 
 97
 Appellant Redd claims prejudicial joinder in light of the serious disparity of evidence against him as compared to the other defendants. His motion for severance was denied. The indictment placed him in the area of the narcotic transactions on only several occasions.
 
 
 98
 The trial court has great discretion in severance matters, with the balance generally to be "struck in favor of joint trials." United States v. Hines, 147 U.S.App.D.C. 249, 266, 455 F.2d 1317, 1334, cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972).
 
 
 99
 Absent a dramatic disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to give individual consideration to each defendant. United States v. Haldeman, 181 U.S.App.D.C. 254, 295, 559 F.2d 31, 72 (1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).
 
 
 100
 The government's case against Redd included testimony of the informant Whaley together with audio and video tapes of the sales. The evidence was independent and substantial. The trial judge properly instructed the jury to determine the guilt or innocence of each defendant separately. (Tr. at 2165-66). The record simply does not show that Redd's conviction was prejudicially based on evidence against his co-defendants.
 
 IV.
 CONCLUSION
 
 101
 In this appeal, the appellants have jointly and individually raised several challenges to their convictions before the trial court. The multitude of issues is not surprising, since the complex indictment charged all defendants with conspiracy and with substantive crimes arising from participation in a complex heroin sales ring. Because drug conspiracy cases invite difficulties at the trial level, we have reviewed the evidence and considered the arguments in great perhaps tedious detail.
 
 
 102
 We have delineated and discussed several problem areas in this extensive record. Given the overwhelming independent evidence against the appellants, the errors which are discussed do not have a cumulative prejudicial effect requiring reversal of the convictions. The one exception is the conspiracy conviction of appellant Arthur Watson, which is reversed and remanded for a new trial due to improper impeachment. The convictions of all other appellants are affirmed.
 
 
 103
 APPENDIX A
COUNT DATE PURCHASER(S) TAPES DEFENDANTS VERDICT
----------------------------------------------------------------
 2 April 5 Patterson none O.Johnson Guilty
 3 April 8 Patterson none J.R.Johnson Guilty
 O. Johnson Guilty
 4 April 12 Patterson none J.R. Johnson Guilty
 5 April 13 Patterson none J.R. Johnson Guilty
 6 April 21 Patterson none J.R. Johnson Guilty
 7 May 4 Ward/Smith none J.R. Johnson No Verdict
 Watson Not Guilty
 8 May 5 Ward/Smith none J.R. Johnson Guilty
 9 May 17 Ward/Smith none O. Johnson Not Guilty
 10 June 8 Whaley none O. Johnson Not Guilty
 11 June 15 Whaley Audio J.R. Johnson Guilty
 12 June 15 (narcotics none J.R. Johnson Guilty
 seized from O. Johnson Not Guilty
 mailbox)
 13 June 21 Smith none J.R. Johnson Not Guilty
 Slade Not Guilty
 14 June 23 Whaley Audio J.R. Johnson Guilty
 O. Johnson Not Guilty
 Slade Guilty
 Marshall Not Guilty
 Redd Guilty
 15 June 23 (narcotics none J.R. Johnson Guilty
 seized from O. Johnson Not Guilty
 tree) Slade Guilty
 Marshall Not Guilty
 Redd Not Guilty
 16 July 26 Whaley Audio J.R. Johnson Guilty
 Slade Guilty
 17 Aug. 18 Whaley none J.R. Johnson Not Guilty
 Watson Not Guilty
 Slade Not Guilty
 18 Sept 17 Ward/Smith Audio O. Johnson Disagreement
 Watson Not Guilty
 Slade Not Guilty
 Jones Not Guilty
 19 Sept. 22 Ward none Slade Disagreement
 Marshall Not Guilty
 Jones Not Guilty
 20 Sept. 28 Ward/Smith none J.R. Johnson Not Guilty
 O. Johnson Not Guilty
 Watson Not Guilty
 Slade Not Guilty
 Marshall Not Guilty
 21 Sept. 29 Ward/Smith Video J.R. Johnson Guilty
 Marshall Guilty
 22 Sept. 29 Whaley Video J.R. Johnson Guilty
 and Slade Guilty
 Audio Redd Guilty
 
 BAZELON, Senior Circuit Judge, concurring:
 
 104
 I agree with my brethren that the errors complained of did not contribute to conviction, see Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230-231, 11 L.Ed.2d 171 (1963), except as to appellant Watson. See pp. 307-308, supra. I write separately because I believe that the number of errors raised on appeal warrants comment.
 
 
 105
 It is not surprising that errors may occur in a trial of connected, complex cases, prosecuted zealously. Here, the prosecution played nearly inaudible tapes for the jury and had the jury read transcripts prepared by the government but never admitted into evidence. Prosecution witnesses made repeated references to "the organization," although a major issue at trial was the existence of a conspiracy. The prosecution also successfully proposed a conspiracy instruction directing the jury to examine "all of the evidence," but there is no indication that the trial judge made a determination to admit the co-conspirator hearsay statements included in that evidence.
 
 
 106
 As this court's opinion elaborates, each of these problems could have been avoided by observing settled precedents: the trial court should have considered the tapes at pretrial rather than waiting to hear them in the presence of the jury; similarly, it should have determined the accuracy of the transcripts before permitting the jury to read them; and it should not have directed the jury to consider "all the evidence" without at least first ruling explicitly on the competency and admissibility of co-conspirator statements swept into evidence against individual defendants by the instruction. Finally, it ought to have framed its initial reprimand with sufficient firmness to ensure that references to "the organization" were not repeated.
 
 
 107
 Although we find the practices complained of are harmless here, they are not approved. Evidence of guilt must not obscure our commitment to fairness.[1]
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 Defendant Mary Ann Jones, aka Mary Ann Brown, was not convicted of any count. Defendant Donald Larry Baxter was reported a fugitive and apparently died prior to trial
 
 
 [2]
 Count 23 of the indictment charged appellants Stampede Johnson and Odell Johnson with conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848. Because both were acquitted thereunder, the appeal does not address Count 23
 
 
 [3]
 This chart was prepared by appellate counsel for Watson and Marshall and was referred to by both appellants and government counsel in the briefs
 
 
 [4]
 Appellant Watson was acquitted of all four substantive distribution counts with which he was charged
 
 
 [5]
 For example, at one point the judge stated: "you may have heard it clearly, but, . . . I didn't." (Tr. at 637). See also Tr. at 484, 647, 669 and 697
 
 
 [6]
 Shrader testified that he gained Stampede Johnson's confidence by making an exaggerated claim of legal expertise and then helping him with some legal matters
 
 
 [7]
 In 1973, Shrader was to have been a witness against his sister's fiance, who was charged in federal court with kidnapping and extortion. Under the government Witness Protection Program, Shrader was given a new name and job. When he learned that the fiance had been released and knew his whereabouts, Shrader fled, taking along $600 belonging to his employer. The government located him three years later and charged him with misprision for concealing evidence and with embezzlement. Shrader pled guilty to misprision and, at the time of his testimony, the embezzlement charges were pending
 
 
 [8]
 The trial judge also denied a pretrial motion to exclude use of the transcripts, based in part on the poor quality of the tapes, without listening to the tapes or making any findings as to the quality of the tapes. The prosecutor alone asked the court to examine the tapes and transcripts for audibility and accuracy. Defense counsel heard the tapes and examined the transcripts before trial
 
 
 [9]
 See n. 8 supra and accompanying text
 
 
 [10]
 Indeed, only counsel for defendant Jones accepted the prosecutor's invitation to participate in preparation of a mutually agreeable version, and the prosecutor thereafter changed the transcript in several ways requested by counsel. Apparently the government made further changes later
 
 
 [11]
 Brief for appellant John Roscoe Slade at 15
 
 
 [12]
 Whaley's dependence on the transcripts during testimony presumably was taken into account by the jury in evaluating credibility
 
 
 [13]
 The only audio tape made by Ward, in connection with count 18, did not lead to convictions. For this reason, the Court does not address Slade's objections that there is less evidence of Ward's participation in transcript preparation than there is of Whaley's
 
 
 [14]
 Brief for appellant David Redd at 12
 
 
 [15]
 Appellants are led by Redd in this argument, since he was convicted almost solely on the basis of Whaley's testimony
 
 
 [16]
 Brief and Appendix for Appellee at 20
 
 
 [17]
 The trial court's several instructions to the prosecutor to avoid a "worrisome situation," (Tr. at 311); "to be a little more careful," (Tr. at 654); and to stop "over-trying the case" (Tr. at 657), may have served to limit references to an "organization," but obviously did not solve the problem
 
 
 [18]
 The appellants do not contest that John R. Johnson's alias was Stampede, a fact clearly proven by government witnesses. The appropriate analogy here for Hilliard/"Meatball" is "Stampede's organization"/ conspiracy
 
 
 [19]
 Defense counsel never specifically objected to the "all the evidence" charge offered by the government, though they discussed the conspiracy instruction at length with the judge and the prosecutor. (Tr. at 1400-20). See Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977). This is not to say, as the government argues, that the issue has not been preserved on appeal. There is no question but that defense counsel desired the standard Redbook conspiracy instruction (Tr. at 1097) and specifically objected to any deviation from that "time-tested" instruction. (Tr. at 1446)
 
 
 [20]
 The Second Edition of the Redbook, in use at the time of trial, contained a virtually identical instruction. The same instruction appears in Devitt & Blackmar, Federal Jury Practice and Instructions, P 2705 (3d ed. 1977)
 
 
 [21]
 If the evidence is admitted "subject to connection" and the government fails to prove the necessary connection, the court should strike the statements and instruct the jury to disregard it or else declare a mistrial. Jackson, at 1218 of 627 F.2d; Gantt, at 845 of 617 F.2d. If the court instead finds that the government has made the requisite showing and has admitted the statements, the court should apply the traditional standard to all the evidence in determining whether to submit the entire case to the jury. See Curley v. United States, 160 F.2d 229, 232 (D.C.Cir. 1947), cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947) (judge to determine whether "a reasonable mind might fairly conclude guilt beyond a reasonable doubt")
 
 
 [22]
 As appellants Watson and Marshall point out in their reply brief, even assuming that this ruling shows the trial judge did make a preliminary determination of admissibility, it remains possible that he himself considered "all the evidence," including co-conspirator statements, in finding that defendants had been shown to be conspirators. In no way did the trial judge specify what standard of proof he thought appropriate
 
 
 [23]
 See section E infra
 
 
 [1]
 Cf. Harrington v. California, 395 U.S. 250, 256, 89 S.Ct. 1726, 1729, 23 L.Ed.2d 284 (1969) (Brennan, J., dissenting) ("The focus of appellate inquiry should be on the character and quality of the tainted evidence as it relates to the untainted evidence and not just on the amount of untainted evidence.")